FILED

OCT 13 2015

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WEIRTON MEDICAL CENTER, INC.,                )
                                             )
                    Plaintiff,               )
                                             )       5:15· CV·131 Stomp
           v.                                )
                                             )
QHR INTENSIVE RESOURCES, LLC,                )
                                             )
                    Defendant.               )

## COMPLAINT AND MOTION TO
## VACATE ARBITRATION AWARD

Plaintiff, Weirton Medical Center, Inc., by its undersigned counsel files pursuant to 9 U.S.C. § 10 this Complaint and Motion to Vacate an Arbitration Award by Gregory G. Binford Esq. dated August 12, 2015, and in support thereof avers as follows:

### Introduction

1.    This action is filed pursuant to the Federal Arbitration Act, 9 U.S.C. §10, seeking to vacate an $1,486,903.11 arbitration award in favor of Defendant on August 12, 2015 by a single arbitrator, Gregory G. Binford, Esq.

2.    Pursuant to the parties' Arbitration Provision, the Arbitrator was required to issue an award that was based upon the parties' Agreement and the applicable law and judicial precedent, and was required to provide his written explanation for the award.

3.    The August 12, 2015 Award did not meet these mandatory requirements as that document was devoid of the Arbitrator's own reasoning and analysis, and was nothing more than

QIR's 49 page proposal for findings of fact and conclusions of law with the Arbitrator's signature affixed. [1]  As a result, the Arbitrator signed a document that, among other things:

    (a)    ignored the uncontroverted facts and evidence presented;

    (b)    failed to decide all of the disputes between the parties, including WMC's main claims and defenses, including QIR's failure to analyze all functional areas of WMC's revenue cycle, and the fraud perpetrated on WMC to induce it into the contract at issue;

    (c)    manifestly disregarded the law by excluding extrinsic evidence presented by WMC while at the same time accepting that of QIR;

    (d)    manifestly disregarded the law by applying the gist of the action doctrine to preclude WMC's tort claims, including negligence and breach of fiduciary duties;

    (e)    manifestly disregarded the law of West Virginia by holding without any citation that West Virginia law does not permit the causes of action of disloyalty and corporate waste when both causes of actions have been adopted as breaches of fiduciary duties in West Virginia;

    (f)    manifestly disregarded the law of West Virginia concerning "borrowed servants" and limitation of liability clauses; and

    (g)    permitted and relied upon the waived affirmative defense of "illegality."

    4.    The award should be vacated on the grounds that (1) the arbitrator exceeded his powers and so imperfectly executed his power so that a mutual, final, and definite award on the subject matter was not made, (2) he manifestly disregarded the law, and (3) his/QIR's Award fails to draw its essence from the parties' contract.  A copy of the award is attached as Exhibit A.

---

[1]    In total, there are four superficial changes in the entire 14,344 word document.  These superficial changes include merely adding the location  of the hearing and its end time in the introduction, and deleting the word "outset" and adding the words "after QIR's Motion is filed" in the conclusion.  Not a single modification was made to the 77 paragraphs of findings of facts, or the 98 paragraphs of conclusions of law.  There is, quite simply, no indication that the Arbitrator actively wrestled with the claims and issues presented, that he gave any meaningful consideration to the evidence presented, or that he made his own reasoned decision.

## The Parties

5.      Plaintiff, Weirton Medical Center, Inc. ("WMC" or "Hospital"), is a non-profit, acute care hospital located in Weirton, West Virginia.

6.      Defendant, QHR Intensive Resources, LLC, ("QIR") is a limited liability company formed in Delaware with a principal place of business located at 4000 Meridian Blvd, Franklin, TN 36067.

## Jurisdiction and Venue

7.      This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332.  The matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and complete diversity of citizenship exists between the parties.  WMC is a corporation organized and existing under the laws of West Virginia with its principal place of business in Weirton, West Virginia and QIR is a limited liability company formed in Delaware with its principal place of business in Franklin, Tennessee.  No member of the QIR is a citizen of West Virginia.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in Weirton, West Virginia and because the contract between WMC and QIR was formed, executed and partially performed in Weirton, West Virginia.

9.      The Federal Arbitration Act applies because the underlying contract arises from and involves interstate commerce.

## Background Facts

10.    In 2009, the Hospital was in financial distress.  After concluding that internal changes would not restore the Hospital to profitability, Hospital management looked externally to solve its financial crisis.

11.    Efforts to partner or merge with other local or regional hospitals were unsuccessful.  However, one of the potential partners, Community Health Systems, Inc., the parent of Quorum Health Resources, LLC ("Quorum"), directed WMC to Quorum.

12.    Expressing that it was interested in potentially investing in WMC, Quorum set up a meeting with WMC, and WMC and Quorum looked at the potential purchase or lease of the Hospital by Quorum.

13.    During the period in which Quorum was purportedly doing its due diligence, Quorum convinced the Hospital to place Stephen Miller, an employee or independent contractor of Defendant and its affiliates, in the position of interim-CFO at WMC.

14.    Though representing that Mr. Miller had the requisite skills and experience to act as the CFO of a West Virginia Hospital, Mr. Miller did not have any such experience in West Virginia.

15.    Though representing that Mr. Miller was to be a "borrowed employee" of the Hospital, he was not.  Instead, unbeknownst to WMC, he was secretively a member of Defendant's sales team seeking to land a lucrative "turnaround" engagement.

16.    Mr. Miller continued to report to, be supervised by and controlled by Defendant or its affiliates.

17.     After purportedly conducting its due-diligence, Quorum told WMC that "we can't own you or buy you, but we will do a 'turnaround'" after which Quorum said it then might be interested in investing in WMC.

18.     Quorum advised WMC that working with Quorum would position the Hospital for future financial success, and that it would help recruit physicians.

19.     Quorum specifically identified a revenue cycle review that included managed care reimbursements as a key element of the proposed "turnaround" engagement.

20.     Quorum, which began interchangeably using the name QHR and QHR Intensive Resources, LLC ("QIR"), continued to represent that it would stabilize and improve the Hospital's financial condition, and that it possessed extensive knowledge and experience working with West Virginia state regulatory and reimbursement requirements and that it had a deep bench of physicians and other professionals from which to recruit.

21.     Based on these representation, the Hospital entered into an "Agreement For Hospital Administration Services" with QIR effective May 1, 2010 (the "QIR Contract" or "Agreement").   A copy of the QIR Contract is attached hereto and incorporated herein as Exhibit B.

22.     The QIR Contract consists of Standard Terms and Conditions and four separate Addenda.  Pursuant to the Standard Terms and Conditions, QIR/QHR placed its personnel in the positions of Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") at the Hospital.  (Ex. B, QIR Contract, §2.1.1).

23.     By virtue of these placements, the financial and operational aspects of the Hospital were managed and controlled by QIR and the Hospital was led to believe that through the QIR Contract and the placement of these individuals at the Hospital, WMC would receive the

services necessary to complete a turnaround of the Hospital, including, *inter alia*, (a) the enhancement of its net revenue through a top-to-bottom review of and corrections to its revenue cycle, including the realization of additional net revenue under its managed care contracts, and (b) the recruitment of physicians to increase patient volumes at WMC.

24.     Addendum 2 to the QIR Contract sets forth many of the turnaround services that QIR promised to perform "as part of the Fixed Annual Fee."  Those services included the following:

> **1.c.  Revenue Cycle Management**
>
> QIR will conduct an in-depth analysis of **all of the functional areas of revenue cycle process that can have an impact on the hospital's cash and cash flow.  Analysis includes:**
>
> - Identify cash acceleration opportunities within the hospital's accounts receivables;
>
> - **Identify opportunities to improve charge capture**, denials management and bad debt management;
>
> - **Provide a high level assessment of the hospital's revenue cycle operations**, identify opportunities for improvement, and develop a management action plan (MAP) that will support the implementation of QIR's recommendations;
>
> - Work with hospital leadership to implement recommendations for improvement, including providing Project Management direction;
>
> - A detailed management action plan (MAP) can be used to report progress of recommended actions;
>
> - Summary report including findings and recommendations for improvement with associated returns on investment;
>
> - Monthly Scorecard on progress.

(Ex. B., Addendum 2 to QIR Contract, Section 1.c.) (emphasis added)

25.     Addendum 2 to the QIR Contract, also, contained a separate and independent obligation on the part of QIR to maximize the reimbursements to be obtained through renegotiated managed care contracts.  That section of the QIR Contract reads in part as follows:

**1.i.  Managed Care Contract Services**

QIR's guidance in hospital contract negotiations will help the Hospital:

- **Protect and positively affect the net revenue** of the hospital;

(WMC Ex. 8, Addendum 2 to QIR Contract, Section 1.i) (emphasis added).

26.     Although the contract states that QIR would "guide" the Hospital in managed care contract renegotiations, QIR actually took control and performed the actual negotiations of the managed care contract, including purported modeling of those contracts.

27.     QIR falsely and without any basis represented to the Hospital's Board that the renegotiated rates would result in millions of dollars of additional reimbursement revenue.

28.     The additional revenue represented by QIR did not materialize.

29.     Neither the obligation to conduct an in-depth analysis of all functional areas of the revenue cycle process, nor the obligation to negotiate managed care contracts to positively affect net revenue could possibly be performed without an analysis of the reimbursement rates permitted in the managed care contracts and the rates set on WMC's chargemaster filed with the West Virginia Health Care Authority (i.e., the price the Hospital charges on the bills it sends out).

30.     The relationship between the Hospital's managed care contract rates and the rates set on its chargemaster was a functional area of the revenue cycle process.

31.     At no time during the engagement, whether as part of an in depth analysis of all functional areas of the revenue cycle process, the modeling of the managed care contracts, or the negotiation of the managed care contract did QIR review or analyze the relationship between the rates permitted under the managed care contracts and the rates charged under the Hospital's chargemaster.

32.     QIR failed to undertake this analysis despite the fact that the managed care contracts had "lesser of language" by which the managed care contract providers were only required to pay the lesser of the rate allowed under the managed care contracts and the rate set on the chargemsater.

33.     QIR failed to undertake this analysis despite the fact that the laws and regulations of West Virginia only permit Hospitals in West Virginia to charge rates set in their chargemaster filed with the state.

34.     WMC contended in the arbitration that this was a breach of QIR's obligation under QIR Contract, Sections 1.c. and 1.i.

35.     Shortly after the QIR Contract was signed, Mr. Miller, who internally within QIR and its affiliates, admitted his lack of any experience in regulatory and reimbursement matters in West Virginia, sought guidance from QIR and Quorum in implementing the Hospital's yearly rate increase granted by the West Virginia Health Care Authority.

36.     The representations of extensive knowledge and experience working with West Virginia state regulatory and reimbursement requirements to induce WMC into the QIR Contract were false when made. This was one of the misrepresentations used to induce WMC to enter into the QIR Contract.

37.     WMC was harmed and would not have entered the engagement if it had known that QIR lacked any meaningful experience in the state's regulatory and reimbursement requirements contrary to the express representations made to WMC.

38.     Though having no experience in implementing such a rate increase in West Virginia, QIR and/or its affiliate Quorum rashly undertook to price the Hospital's chargemaster in what they contended was a strategic manner, but they ignored the crucial interplay between the chargemaster and the managed care contracts.

39.     They did this by selecting and applying a tool that did not take into account the reimbursement rates permitted under the managed care contracts thus leaving significant revenue on the table.

40.     In strategically pricing the Hospital's chargemaster, QIR or Quorum used QRATE, a tool that, Ms. Libby Britt, the person charged by QIR or its affiliate with strategically pricing the Hospital's chargemaster, admitted was not a pricing tool but was a budgeting tool and that it was not the right tool for the job.

41.     Ms. Britt further testified that she would not recommend QRATE where, as here, the managed care contracts were not percentage of charge based.

42.     QRATE was the wrong tool for the job and WMC would have received greater reimbursements if a tool taking into account the managed care contracts had been used.

43.     QIR caused WMC to send out incorrect bills for actual transactions that the Hospital did perform and for which the Hospital actually incurred costs for which it was not fully compensated.

44.     The Hospital contended in the arbitration that this was another breach of the QIR Contract and, in the alternative, that if strategic pricing services were not part of the QIR Contract, then QIR having held itself out as having extensive knowledge and expertise was negligent in performing these extra-contractual services in an incompetent manner.

45.     The uncontroverted testimony of both QIR's and WMC's experts established that these failures and improper actions resulted in WMC receiving substantially lower reimbursements than that to which it was entitled under the managed care contract for the services it had rendered.

46.     WMC's experts, who were accepted as experts at the hearing, testified in their professional opinion that the Hospital was injured in an amount exceeding $5 million.

47.     Pursuant to the QIR Contract, QIR was also obligated to prepare a Physician Recruitment Plan. (Ex. B, Addendum 2 to QIR Contract, Section 1.j.). By virtue of placing its employee in the position of COO, QIR was obligated to recruit physicians to meet the needs of the Hospital.

48.     QIR knew that one of the primary goals of WMC in hiring a turnaround specialist was to recruit physicians.

49.     QIR admitted that this was one of the primary goals of the "turnaround" engagement.

50.     Quorum touted its abilities in physician recruitment, its deep bench and it represented that it was familiar with the Hospital's vacancies and that it was confident that it could come in and address those vacancies.

51.     No such meaningful recruitment occurred, as unbeknownst to WMC until the hearing in this arbitration, physician recruitment was not anything QIR had done before, in fact, QIR was prohibited from doing that from by its parent.

52.     The undisclosed bar against QIR's recruitment of physicians and its lack of any pool from which to recruit made the failure of this primary objective of the turnaround engagement a forgone conclusion.

53.     As a result, the Hospital's volume of procedures declined during QIR's tenure, and the Hospital's financial condition worsened.

54.     WMC contended in the arbitration that QIR's failure to recruit physicians was a breach of the QIR Contract, and upon learning at the hearing that the representations made to it to induce it to enter into the contract were patently false, WMC argued that it had been fraudulently induced into the QIR Contract, which was therefore void, and that, at the very least, extrinsic evidence of the parties' intent should be permitted. [2]

---

[2]     WMC discovered for the first time, as a result of the arbitration hearing and the positions taken by QIR in the arbitration, that WMC had been a victim of a bait-and-switch orchestrated and perpetuated, by, among others, Community Health Systems, Inc. ("CHS") and Quorum Health Resources, LLC, to entrap WMC into a costly engagement described as a "turnaround" engagement, but which was nothing more than a scheme to extract millions of dollars from the hospital for paper reports.  To do this, CHS and Quorum dangled a potential investment in the Hospital, misrepresented the results-oriented nature of the "turnaround" engagement, and misrepresented the purported resources, experience and skills that would be made available. Most notably, this included the existence of a deep bench of physicians and experience in recruiting physicians.

Instead of a contract with Quorum, WMC was surreptitiously placed into a contract with QHR Intensive Resources, LLC ("QIR"), a wholly owned subsidiary of CHS and Quorum.  Though WMC was advised that the name of the entity did not alter the engagement, QIR, as WMC learned in the arbitration, had a different opinion and would take the positon that the contract was simply a "consulting" agreement absent any implementation deliverables necessary to complete financial "turnaround."  Contrary to the representations made to WMC to entrap it into the "turnaround" engagement, WMC discovered in the arbitration that QIR, far from having a deep bench and recruiting experience, was actually prohibited from recruiting physicians by its corporate parents and that had it no experience, skill or resources to recruit physicians.  Because

-11-

### QIR Breached the Contract By Failing To Recommend and Implement an Electronic Medical Records System

55.     Pursuant to the QIR Contract, QIR was obligated to identify the information technology investments needed to support the Hospital's business, prioritize those investments and **implement** them.  (Ex. B, Addendum 2 to QIR Contract, Section 1.j).

56.     Centers for Medicare and Medicaid Services ("CMS")  instituted a program for all participating hospitals to begin utilization of an "Electronic Health Record."

57.     CMS offered incentive payments to hospitals that implemented the program and demonstrated "meaningful use" within a designated time period.  The incentives were staged with a Phase I incentive of $1.8 million available for those Hospitals that demonstrated meaningful use by a CMS imposed deadline.

58.     The implementation of an electronic health record system was not optional.  If such a system was not implemented with meaningful use by a designated time period, significant penalties would be imposed by CMS.

59.     Despite the obvious need to implement an electronic records system, and the benefit of doing it in time to obtain the federal incentives, QIR failed to place the Hospital in the position to do so even though QIR originally recognized the "time constraints" and the need to begin the process quickly in the summer of 2010.

59.     Further, a project of this magnitude could not have been started until new financing was in place, and there is no evidence that the Hospital's Board was advised of this condition.

---

CHS and Quorum were not parties to agreement and were not part of the arbitration, WMC has instituted a lawsuit against these entities for this fraudulent bait-and-switch.

60.     QIR waited over a year to develop a plan in the abstract and that delayed plan was so complex requiring a complete change to the Hospital financial system that it was not feasible.

61.     Ultimately, though QIR had been at the Hospital from 2009 through November of 2011, QIR took no meaningful action beyond a few interviews with potential vendors to move the Hospital to toward obtaining "meaningful use" attestation necessary to  receive the $1.8 million available from CMS.

62.     As a result, the Hospital forever lost the opportunity to obtain the $1.8 million incentive.

### QIR Manipulated WMC's Financial Statements and Made Baseless and False Representations to the Hospital

63.     QIR misrepresented the true state of the Hospital's deteriorating financial condition providing false and baseless revenue projections, and by actively concealing the truth.

64.     QIR made repeated misrepresentations to the Hospital's Board that millions of dollars of additional reimbursement revenue would be forthcoming as a result of QIR's efforts in negotiating the Hospital's managed care contracts.

65.     The additional net revenue did not materialize and QIR withheld and concealed the basis (or lack thereof) upon which it made these false representations, including withholding the purported modeling and work papers used in negotiating the new contracts.

66.     QIR, also, improperly modified the long-established method for booking the Hospital's accounts receivable to make the hospital finances appear better than they were.

67.     Arnett Foster, PLLC, which was hired to audit the Hospital in 2011 and 2012, determined that QIR's modification was unreasonable and in violation of generally accepted accounting principles.

68.     QIR's improper accounting resulted in millions of dollars of write-offs in 2011 and 2012 and the realization that the Hospital's finances were not the rosy picture painted by QIR, but were in fact deteriorating rapidly.

69.     The QIR engagement resulted in the deterioration of hospital finances, a lack of increased reimbursements, no meaningful physician recruiting, and the misstatement of the Hospital's Accounts Receivable.

70.     QIR used the misstated financial condition of the Hospital and baseless representations of increased net revenue to misrepresent the effects of QIR's activities at WMC and to keep the Hospital entrapped in an expensive "turnaround" engagement wasting the Hospital's assets in an amount exceeding $4 million and delaying the Hospital's ability to take necessary actions to right its financial condition.

71.     QIR's engagement was terminated effective December 7, 2012 before all of QIR's breaches of contract,  fraud, fraudulent concealment and misdeeds became known to WMC.

### The Arbitration and Award

72.     On January 5, 2012, QIR filed its Demand for Arbitration and made its statement of claim on May 11, 2012 claiming breach of contract for what it asserted were unpaid invoices and for unjust enrichment.

73.     On June 15, 2012, WMC answered and asserted affirmative defenses.   The primary affirmative defense was based upon QIR's material breach of, among others, Sections 1.c and 1.i of Addendum 2 to the QIR Contract, for its failure to have analyzed all of the functional

areas of the revenue cycle process, namely the relationship between WMC's managed care contracts and its chargemaster.

74.     WMC, also, asserted counterclaims  for breach of contract, breach of the covenant of good faith and fair dealing, fraud, breach of fiduciary duties including the duty of loyalty and corporate waste, fraudulent and intentional misrepresentation, negligent misrepresentation and negligence.

75.     On July 2, 2012, QHR replied to WMC's counterclaims, and the pleadings were closed.

76.     Pursuant to the Arbitrator's Scheduling Order, as amended, discovery closed on December 31, 2014, pre-hearing briefs were to be filed in March of 2015 and the hearing took place the week of April 13, 2015.

77.     On March 26, 2015, QIR asserted for the first time affirmative defenses, including the affirmative defenses of  contributory and comparative negligence, assumption of the risk, laches and illegality.

78.     Article VIII of the Agreement, entitled Alternative Dispute Resolution states that:

> [A]ny controversy arising out or relating to this Agreement, or breach, termination or validity thereof, shall be determined by binding arbitration in Pittsburgh, PA, in accordance with the provisions of this Article VIII and the arbitration rules of the American Arbitration Association ("AAA") in effect on the date of this Agreement by a single arbitrator . . . . **The arbitrator shall base the award on this Agreement, and the applicable law and judicial precedent, and shall accompany the award with a written explanation of the reasons for the award**.   The arbitration **shall be governed by the substantive and procedural laws of the State of West Virginia** applicable to contracts made and performed therein. . . .

### The Arbitration Award Must be Vacated

79.     An Arbitration award may be vacated when an arbitrator exceeds his powers, and so imperfectly executes them so that a mutual, final and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10 (a)(4).  In addition to the specific grounds set forth in the FAA, it is well settled that a Court may vacate an arbitration award if it (1) fails to draw its essence from the contract; (2) evidences manifest disregard of the law; or (3) violates well settled and prevailing public policy. See Patten v. Signator Ins. Agency, Inc., 441 F.3d 230, 235 (4th Cir. Mar. 13, 2006); Upshur Coals Corp. v. United Mine Workers of America District 31, 933 F.2d 225, 229 (4th Cir. 1991); Remmey v. PaineWebber, Inc., 32 F.3d 143, 149 (4th Cir. 1994); Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996).

### The Arbitrator Exceeded His Power and Manifestly Disregarded the Law of West Virginia Concerning Waiver of Affirmative Defenses

80.     Pursuant to the Arbitration provision, the Arbitration was to be  governed by the *substantive and procedural laws* of the State of West Virginia.

81.     In contravention of the express requirement in the Arbitration provision, the Arbitrator failed to govern the arbitration by the procedural laws of the State of West Virginia and failed to base his award on the applicable law and judicial precedent.

82.     The Arbitrator manifestly disregarded the law of West Virginia in direct contravention of West Virginia Rule of Civil Procedure 8(C) by permitting the last minute assertions of waived defenses, including those of contributory negligence, laches and illegality to the prejudice of WMC.

83.     By permitting (without any explanation) QIR to amend its pleadings on March 26, 2015 to include a defense of "illegality" and then relying on that defense in his/QIR's Award, the Arbitrator exceeded his power and manifestly disregarded the law of West Virginia.

### The Arbitrator Exceeded His Powers By
### Not Providing His Written Explanation of The Award

84.     Pursuant to the Arbitration provision, the award was to be accompanied by the Arbitrator's written explanation for the award, a requirement that was further stressed in the Third Amended Scheduling Order agreement which required a reasoned award.

85.     In violation of the Arbitration Provision, the Arbitrator did not provide his reasoned award.  Instead, on August 12, 2015, Mr. Binford simply signed Defendant's Proposed Finding of Facts and Conclusion of Law without making a single substantive change, addition, or deletion to  that 49 page document and no changes in more than 14,000 words compromising QIR's 77 paragraphs of findings of facts or the 98 paragraphs of conclusion of law. Compare Arbitrator's Finding of Facts and Conclusion of Law (Exhibit A) with QIR Proposed Findings of Facts and Conclusion of Law (Exhibit C).

86.     By failing to undertake his own analysis or provide his written explanation, the Arbitrator violated the arbitration provision's requirements and exceeded his powers.

### The Arbitrator Failed to Address WMC's
### Primary Breach Of Contract Claim and Affirmative Defense

87.     The Arbitrator failed to address WMC's most significant affirmative defense and primary counterclaim (i.e., that QIR materially breached its obligation to conduct "an in-depth analysis of **all of the functional areas of revenue cycle** process that can have an impact on the hospital's cash and cash flow") by failing to analyze or even review the relationship between the managed care contracts and the Hospital's chargemaster.

88.     By failing to address the scope of this critical contract provision with respect to whether the relationship between rates available under managed care contracts and those set forth on the Hospital's chargemaster was a "functional area of the revenue cycle process," the Arbitrator exceeded his powers by failing to address the entire controversy placed before him, failing to issue an award that drew its essence from the parties' agreement, and failing to issue an award that was mutual, definite and final.

### The Arbitrator Manifestly Disregard
### West Virginia's Rules for Contract Interpretation

89.     By simply signing QIR's proposed findings of facts and conclusion of law without a single substantive change, the Arbitrator only addressed the separate issue that QIR characterized as whether "strategic pricing services" were required as part of the QIR Contract.

90.     Even with respect to the separate issue of whether the QIR Contract required strategic pricing services, the Arbitrator manifestly disregarded the rules of contract interpretation in West Virginia by failing to consider the course of performance between the parties and by precluding parol evidence to interpret an inherently ambiguous contract clause in manifest disregard of the law.  Restatement (Second) of Contracts § 202; FOP, Lodge No. 69 v. City of Fairmont, 196 W. Va. 97 (1996); Ashbaugh v. Chesapeake & Ohio Ry. Co., 72 W. Va. 765, 79 S.E. 741, 743 (1913) ("when the contract … is general or ambiguous, the intention of the parties may be shown by parol evidence of their contemporaneous acts and declarations.").  See also Markey v. Brunson, 286 F. 893, 895 (4th Cir. 1923) ("when the term used admits of more than one meaning, or is not clear otherwise, the actual state of the knowledge which the parties had on the subject of the contract may be inquired into in order to ascertain the intention.").

**The Arbitrator Failed to Rule on and Consider**
**<u>WMC's Contention that the QIR Contract Was Fraudulently Induced</u>**

91.     In the Arbitration,  QIR (1) disclaimed that the "turnaround" engagement had any implementation deliverables, let alone, the "result oriented" implementation which Quorum touts; (2) took the position that it was not permitted by its parent companies,  Quorum Health Resources, LLC, and Community Health Systems, Inc., to recruit physicians despite the fact that this was a primary objective of the turnaround engagement, (3) admitted that it did not have a deep bench or any bench of physicians from which to recruit, even though WMC had been told that one existed, and (4) took the position that the it had no responsibility to analyze the managed care contracts reimbursement rates and the chargemaster rates as part of its purported analysis of all of the functional areas of the revenue cycle despite the overwhelming evidence and representations to the contrary as discussed above.

92.     The Arbitrator exceeded his powers and failed to issue a mutual, definite and final award by failing to address whether this fraud in the inducement voided the QIR Contract.

93.     The Arbitrator manifestly disregarded the law of West Virginia by precluding parol evidence in the face of QIR's and its affiliates' fraudulent inducement of WMC into the QIR contract. <u>Cardinal State Bank v. Crook</u>, 184 W. Va. 152, 399 S.E.2d 863, 868 (1990) (allowing parol evidence to go to the jury where plaintiff alleged that he was induced to sign a contract that did not accurately reflect the parties' agreement); <u>see also</u> <u>Traders Bank</u>, 704 S.E. 2d. at 696 ("The fact that an agreement is reduced to writing, as it was in this case, does not negate the occurrence of a precedent oral promise that was the motivating factor for making of such agreement.")

94.     The Arbitrator exceeded his powers and manifestly disregarded the law of West Virginia by relying on extrinsic evidence presented by QIR while excluding extrinsic evidence presented by WMC.

### The Arbitrator Failed to Fully Address WMC's Claim that QIR Breached Its Obligations under Addendum 2 to QIR Contract, Section 1.j

95.     The Arbitrator failed to address whether QIR breached its obligation by failing to timely present a feasible plan to the Hospital to reach "meaningful use" attestation and by failing to present a plan that could be implemented at the Hospital in CMS' required time frame. Instead the Arbitrator without his own analysis simply adopted QIR's conclusory contention that QIR was not required to "implement" the plan.

### The Arbitrator's Irrational And Inconsistent Conclusions Precluding WMC's Tort Claims

96.     The Arbitrator concluded that "strategic pricing services" were not part of the QIR contract and such services were not covered by the terms of the QIR Contract.

97.     Despite the conclusion that strategic pricing services were not covered, part of or addressed in the QIR Contract, the Award further concluded that WMC's claim of negligence concerning QIR "strategic pricing" was barred as sounding in contract by the gist of the action doctrine. This conclusion is in manifest disregard of the law of West Virginia.  Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP, 231 W. Va. 577, 746 S.E.2d 568, 577 (2013) ("Succinctly stated, whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract"); see also Bruno v. Erie Ins. Co., 106 A.3d 48, 69 (Pa. 2014) ("[t]he mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered

as the result of actions of the other party in performing the contract as one for breach of contract."); Soyoola v. Oceanus Ins. Co., 986 F. Supp. 2d 695, 707 (S.D. W. Va. 2013).

98.     The Arbitrator manifestly disregarded the law and exceeded his powers by failing to apply the applicable law and judicial precedent as expressly required by the arbitration provision in applying the gist of the action doctrine to WMC's claims for breach of fiduciary duties because these are not contractual duties but are duties inherent in the principal/agency relationship.  3 Am. Jur. 2d Agency § 252, p. 203; Harper v. Jackson Hewitt, Inc., 227 W.Va. 142, 154 (2010) (agency means a fiduciary relationship) (citing 3 Am. Jur. 2d Section 1); Timberline Four Seasons Resort Management Co., 223 W. Va. 730 (2009); Moore v. Turner, 137 W. Va. 299 (1952); see also  Bruno at 71; Alpart v. General Land Partners, Inc., 574 F. Supp. 2d 491, 500 (E.D. Pa. 2008) (gist of action doctrine did not bar fiduciary duty claims that were matters of social policy, not contract).  See also Padalino v. Standard Fire Ins. Co., 616 F. Supp. 2d 538, 550 (E.D. Pa. 2008) (gist of action doctrine did not bar fraud and negligent misrepresentation claims allegedly committed to induce plaintiffs to enter into a contract with insurance company).

### The Arbitrator Manifestly Disregarded the Law in Concluding That West Virginia Does Not Recognize Claims for the Breach of the Duty of Loyalty and Corporate Waste

99.     The Arbitrator manifestly disregarded the law of West Virginia and exceeded his powers by failing to apply the applicable law and judicial precedent as expressly required by the arbitration provision in adopting QIR's uncited and inaccurate conclusion that West Virginia does not recognize a claim for breach of the duty of loyalty when the West Virginia Supreme Court has recognized that this cause of action does exist. 3 Am. Jur. 2d Agency § 252, p. 203; Harper v. Jackson Hewitt, Inc., 227 W.Va. 142, 154 (2010) (agency means a fiduciary relationship) (citing

3 Am. Jur. 2d Section 1); Timberline Four Seasons Resort Management Co., 223 W. Va. 730 (2009); Moore v. Turner, 137 W. Va. 299 (1952)

100.    The Arbitrator manifestly disregarded the law of West Virginia and exceeded his powers by failing to apply the applicable law and judicial precedent as expressly required by the arbitration provision in adopting QIR's uncited and inaccurate conclusion that West Virginia does not recognize a claim for corporate waste when the West Virginia Supreme Court has recognized that this cause of action does exist. Zinn v. Mendel, 9 W. Va. 589 , 590 (1876); see also Elliot v. Farmers' Bank of Philippi, 61 W.Va. 641(1907) (The relationship of officers and directors of a corporation and stockholders and creditors is that of trustees ).

101.    Against the public policy of West Virginia precluding business from deceptive practices, such as fraud, the Arbitrator adopted QIR's uncited and unsupported conclusion that a limitation of liability clause may be used in West Virginia to exculpate one from intentional acts, such as fraud and breach of fiduciary duties, without any analysis of  how a West Virginia court would treat this subject.

102.    In doing so, the Arbitrator ignored that such clauses never exonerate one from future liability for intentional torts as to do so would be against public policy giving individuals license to commit fraud without fear of ever being held accountable.  See e.g., Harvard Eye Assoc. v. Clintec, No. Civ. A. 98-302, 1998 WL 248916 at *1 (E. D. Pa. 1998); Alack v. Vic Tanny Int'l of Mo. Inc., 923 S.W. 2d 330, 337 (Mo. banc. 1996); 6 A Corbin on Contracts, Section 1472 (1962).  Courts routinely hold that limitations of liability clauses are ineffective for intentional torts such as fraud and breach of fiduciary duties. See. e.g., In re American Business Financial Serv. Inc., 362 Bankr. 149, 166 (Bankr. D. Del. 2007); Kalisch–Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 385 (N.Y.1983).

103.   The Arbitrator exceeded his powers and manifestly disregarded the law and evidence by adopting the conclusory assertion in QIR's proposed Award that the Hospital was seeking lost profits when in fact the Hospital was not seeking profits at all, but was seeking to be made whole for services actually rendered as it was operating at significant operating losses during the entire period for which it is seeking recompense.  Similarly, the  $ 1.8 million lost incentive from CMS could not possibly be considered lost profits as it is meant to defray the actual costs involved.

**The Arbitrator Manifestly Disregarded the
Law of West Virginia in Concluding that the
Interim-CFOs and COO Were "Borrowed Servants"**

104.   The Arbitrator manifestly disregarded the law of West Virginia and exceeded his powers by failing to apply the applicable law and judicial precedent as expressly required by the arbitration provision by adopting QIR's conclusion that the individuals placed in the positions of Interim CFOs and COO were "borrowed servants" even though the uncontroverted evidence establishes that these individuals continued to report to, be supervised by and to be controlled by QIR and its affiliates. White v. Bethlehem Steel Corporation, 222 F.3d 146 (4th Cir. 2000).

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., respectfully moves this Court for an Order vacating the August 12, 2015 Award of Arbitrator Gregory G. Binford, Esq. on the grounds stated above, with reasonable costs and attorney's fees and for the Court to award such other relief as it deems just and proper.

Respectfully submitted,

By: __/s/_____

Patrick S. Casey (WV Bar No. 668)
Sandra M. Chapman (WV Bar No. 701)
CASEY & CHAPMAN, PLLC
1140 Chapline Street
Wheeling, WV 26003
(304) 231-2405
(866) 296-2591 (fax)

Dated:  October 13, 2015
2156833.v1

Attorneys for Plaintiff,
Weirton Medical Center, Inc.