IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WEIRTON MEDICAL CENTER, INC.,

       Plaintiff,

v.                              Civil Action No. 5:15CV131
                                             (STAMP)

QHR INTENSIVE RESOURCES, LLC,

       Defendant.


**MEMORANDUM OPINION AND ORDER
DENYING PLAINTIFF'S MOTION TO
VACATE ARBITRATION AWARD,
DENYING PLAINTIFF'S SUPPLEMENTAL
MOTION TO VACATE ARBITRATION AWARD,
DENYING PLAINTIFF'S RENEWED MOTION
TO VACATE ARBITRATION AWARD,
DENYING PLAINTIFF'S MOTION TO SUPPLEMENT
THE RECORD AND TO TAKE DISCOVERY,
DENYING PLAINTIFF'S MOTION TO
DISQUALIFY COUNSEL AND
GRANTING DEFENDANT'S MOTION TO
CONFIRM ARBITRATION AWARD**

The plaintiff, Weirton Medical Center, Inc. ("WMC"), asks this Court to vacate an arbitration award issued against it after years of discovery and a full evidentiary hearing before the arbitrator. The defendant, QHR Intensive Resources, LLC ("QIR"), seeks to confirm that award. WMC has also filed a motion to supplement the record and take limited discovery, and a motion to disqualify QIR's counsel, Ellis R. Lesemann. For the following reasons, WMC's motions are denied and the arbitration award is confirmed.

## I. <u>Background</u>

Weirton Medical Center is a hospital in Weirton, West Virginia that fell on hard financial times. WMC began discussing a relationship with QIR in the Fall of 2009. Eventually, the parties entered into an agreement in which QIR provided hospital administrative services ("the Turnaround Agreement"). Among other things, the Turnaround Agreement provided that: (1) QIR would provide an interim Chief Financial Officer ("CFO") and an interim Chief Operating Officer ("COO"); (2) QIR would provide a revenue cycle assessment; (3) QIR would conduct an information technology assessment and produce a strategic plan for implementing certain information technology systems; (4) QIR would guide the renegotiation of managed care contracts with health insurance companies; and (5) QIR would provide a medical staff development assessment.

After continued lackluster financial performance, but before the engagement term was to end, WMC terminated the parties' agreement and refused to pay QIR's invoices. QIR then forced arbitration in accordance with the parties' arbitration agreement contained in the Turnaround Agreement, alleging that WMC breached the Turnaround Agreement by failing to pay the invoices. WMC argued that it was not obligated to pay the invoices because QIR materially breached the Turnaround Agreement. WMC filed counterclaims for breach of various provisions of the agreement,

negligence, breach of fiduciary duties, and corporate waste. After three years of discovery and a full evidentiary hearing, the arbitrator entered an award in favor of QIR.

WMC filed this civil action to vacate the arbitration award under 9 U.S.C. § 10. ECF Nos. 3, 5. QIR then filed a motion with the arbitrator for attorneys' fees and costs as provided in the arbitration agreement. After discovering that QIR had compensation arrangements with certain witnesses, WMC filed a supplemental motion to vacate the arbitration award to argue that the award was obtained by "corruption, fraud, or undue means." ECF No. 12. The arbitrator denied QIR's motion for attorneys' fees and costs and issued a final award, concluding that the provision for attorneys' fees and costs was unconscionable. QIR then filed a motion to confirm the award, ECF No. 41, and WMC filed a renewed motion to vacate the final award. ECF No. 40.

WMC argues that the award should be vacated because: (1) the arbitrator exceeded his powers or so imperfectly executed them as to make the award unjust; (2) the award is in manifest disregard of the law; and (3) the award was procured by corruption, fraud, or undue means. WMC also filed a motion to supplement the record and take limited discovery, ECF No. 35, and a motion to disqualify

QIR's counsel, Ellis R. Lesemann ("Lesemann"), in order that WMC may take his deposition. ECF No. 25.[1]

## II. Discussion

### A. WMC's Motion to Vacate the Arbitration Award

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, an arbitration award may be vacated on four grounds: "(1) when the award was procured by corruption, fraud, or undue means; (2) when there was evident partiality or corruption on the part of an arbitrator; (3) when an arbitrator was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior causing prejudice to the rights of any party; or (4) when an arbitrator exceeded his or her powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Jones v. Dancel, 792 F.3d 395, 401 (4th Cir. 2015); see also 9 U.S.C. § 10. While the Supreme Court's decision in Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576 (2008), states that § 10(a) "provide[s] the FAA's exclusive grounds for expedited

_____

[1]This Court notes that the parties have exceeded the page limits for their memoranda several times. While Local Rule of Civil Procedure 7.02 does not expressly require the parties to seek the Court's prior approval before filing excessively lengthy memoranda, the better practice is for the parties to file a motion for leave to file excess pages before or contemporaneous with their memorandum. Because of the number and complexity of issues involved in this civil action, this Court finds good cause for considering the parties' excessively lengthy memoranda.

4

vacatur," id. at 584, the United States Court of Appeals for the Fourth Circuit has since confirmed that an award may also be vacated "when the arbitrator 'manifestly disregards' the law." Id.

Generally, "judicial review of an arbitration award in federal court is severely circumscribed and among the narrowest known at law." Jones, 792 F.3d at 401 (internal quotation marks omitted). A court "may not overturn an arbitration award 'just because it believes, however strongly, that the arbitrator[] misinterpreted the applicable law.'" Id. Further, "a court must confirm an arbitration award unless a party to the arbitration demonstrates that the award should be vacated under one of the above . . . enumerated grounds." Id. (internal quotation marks omitted) (citing Hall St. Assocs., LLC v. Mattel, Inc., 552 U.S. 576, 582 (2008)); see also 9 U.S.C. § 9.

WMC argues that the award should be vacated because the arbitrator exceeded his powers, because the award is in manifest disregard of the law, and because the award was procured by corruption, fraud, or undue means.

1.    Whether the Arbitrator Exceeded His Powers

"By its terms, Section 10(a)(4) allows courts to vacate arbitration awards only when arbitrators 'exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'" Jones, 792 F.3d at 405 (quoting 9 U.S.C. § 10(a)(4)). "[A] plaintiff seeking

relief under this provision bears the 'heavy burden' of showing that the arbitrator acted outside the scope of the authority granted by the parties in their contract, by 'issuing an award that simply reflects his own notions of economic justice.'" Id. (quoting Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2068 (2013)).

WMC argues that the arbitrator exceeded his powers by adopting verbatim QIR's proposed findings of fact and conclusions of law and by ignoring some of WMC's claims and defenses.

### a. Adoption of the Proposed Award

WMC argues that the arbitrator exceeded his powers by adopting as his own QIR's proposed findings of fact and conclusions of law. After the arbitration hearing, the arbitrator ordered the parties to each submit post-hearing briefs and "that the parties would each submit . . . their proposed draft findings of fact and conclusions of law and award(s) for the Arbitrator's consideration." ECF No. 22-5 at 2. Both parties actually did submit proposed awards with proposed findings of fact and conclusions of law. ECF Nos. 4-30, 26-16. However, WMC argues that the parties did not agree that the arbitrator would adopt either party's proposed award. Essentially, WMC argues that the arbitrator failed to provide a written, reasoned award as required under the arbitration agreement because he simply adopted QIR's proposed award. WMC argues that the

arbitration agreement obligated the arbitrator to literally write his own award.

It is well settled that an arbitrator has jurisdiction to "adopt such procedures as are necessary to give effect to the parties' agreement" and that "'procedural' questions which grow out of the dispute and bear on its final disposition are presumptively . . . for an arbitrator[] to decide." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 685-86 (2010) (internal quotation marks omitted); see also Dockser v. Schwartzberg, 433 F.3d 421, 426-27 (4th Cir. 2006) (concluding that the arbitrators had jurisdiction to determine the number of arbitrators that would hear the parties' dispute). The questions of whether the parties should submit proposed awards and whether the arbitrator could adopt one of those proposed awards is a quintessential procedural question. The arbitrator was empowered to make a determination on this issue, and this Court will not question that determination so long as it has some reasonable basis in the parties' agreement. See Upshur Coals Corp. v. United Mine Workers of Am., Dist. 31, 933 F.2d 225, 229 (4th Cir. 1991) ("As long as the arbitrator is even arguably construing or applying the contract a court may not vacate the arbitrator's judgment.").

The arbitration agreement required the arbitrator to "accompany the award with a written explanation of the reasons for the award." ECF No. 36-5 at 16-17. WMC argues that the only

possible interpretation of the arbitration agreement is that the arbitrator was required to literally write his own award and that he could not adopt either party's proposed award. However, by the plain language of the agreement, the arbitrator's adoption of QIR's proposed award is "a written explanation of the reasons for the award." The arbitrator's implicit determination that the arbitration agreement permitted him to adopt either party's proposed award as his own is, therefore, reasonably based in the parties' arbitration agreement. Thus, the agreement did not preclude the arbitrator from adopting QIR's proposed findings of fact and conclusions of law.

Further, the arbitrator did not exceed or abdicate his power by adopting QIR's proposed award. In the context of litigation, the Supreme Court has "criticized <u>courts</u> for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 572 (1985) (emphasis added). However, the Court has concluded that those findings may be reversed only for clear error. <u>Id.</u> But, if the circumstances indicate that the district court failed to exercise impartiality in weighing the evidence, the court's findings are subject to increased scrutiny. <u>Id.</u>; <u>see also</u> <u>Aiken Cnty. v. BSP Div. of Envirotech Corp.</u>, 866 F.2d 661, 677 (4th Cir. 1989) (applying the

Supreme Court's decision in <u>Anderson</u> as a four factor "standard,"
and concluding that a district court's adopted findings met that
standard). Similarly, the West Virginia Supreme Court of Appeals
has concluded that it was not <u>per se</u> error for a trial court to
adopt verbatim the prevailing party's proposed order, including
factual findings and legal conclusions, granting summary judgment.
<u>Taylor v. W. Va. Dep't of Health and Human Res.</u>, __ S.E.2d __, No.
14-0679, slip op. at 10-11 (W. Va. Apr. 14, 2016). Thus, if a
district court's seemingly biased adoption of a prevailing party's
proposed findings and conclusions is not reversible as <u>per se</u> error
but is subject to only increased scrutiny on appellate review, it
stands to reason that an arbitrator's adoption of a proposed award
is not subject to vacatur under the FAA, as "judicial review of an
arbitration award in federal court is severely circumscribed and
among the narrowest known at law." <u>Jones</u>, 792 F.3d at 401
(internal quotation marks omitted).

Moreover, there is no indication that the arbitrator did not
exercise impartiality in weighing the evidence. Based on the
parties extensive briefing in this civil action, it is clear that
the parties presented conflicting evidence on many factual issues
and that there was sufficient evidence to support the arbitrator's
findings and conclusions as adopted from QIR's proposed award.
This Court also finds it significant that WMC presented its own

proposed findings of fact and conclusions of law, and the
arbitrator reviewed and rejected them.

### b. Ignored Claims and Defenses

WMC argues that the arbitrator exceeded his powers in issuing
an award that did not consider the parties' entire dispute because
the arbitrator ignored various of WMC's claims and defenses.
Namely, WMC alleges that: (1) the arbitrator ignored its
counterclaim and affirmative defense for breach of contract
regarding QIR's obligation to conduct an analysis of WMC's revenue
cycle based on its alleged obligation to provide strategic pricing
services; (2) the arbitrator failed to consider WMC's allegations
that QIR fraudulently induced it to enter into the Turnaround
Agreement; and (3) the arbitrator failed to address whether QIR
breached its alleged obligation to implement an electronic records
system.

Contrary to WMC's arguments, the award considered and rejected
each of WMC's claims and defenses. First, the arbitrator found
that the agreement did not require QIR to provide strategic pricing
services as part of its obligation to conduct an assessment of the
functional areas of WMC's revenue cycle. The arbitrator
interpreted the phrase "functional area[] in [WMC's] revenue cycle
process" used in the Turnaround Agreement to not include strategic
pricing services. ECF Nos. 22-2 at 29; 2-1 at 9-12. Second, the
arbitrator considered and rejected WMC's claim that it was

10

fraudulently induced into the Turnaround Agreement.  ECF No. 1-2 at 41-42.  Third, the award found that the Turnaround Agreement did not require QIR to implement an electronic records system.  Id. at 13-14.  Thus, the arbitrator did not ignore any of WMC's claims or defenses.

    2.    Whether the Arbitrator Manifestly Disregarded the Law

    The parties' arbitration agreement provides that West Virginia's substantive law applied to the arbitration.  WMC argues that the arbitrator manifestly disregarded West Virginia law by: (1) misapplying contract interpretation principles; (2) misapplying the parol evidence rule; (3) misapplying the gist of the action doctrine; (4) stating that West Virginia does not recognize causes of action for breach of the duty of loyalty and corporate waste; (5) misapplying the borrowed employee standard; (6) concluding that a limitation of liability clause as applied to intentional torts is enforceable under West Virginia law; and (7) in allowing QIR to present waived defenses.  However, WMC misunderstands the manifest disregard standard.

    "A court may vacate an arbitration award under the manifest disregard standard only when a plaintiff has shown that: (1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the arbitrator refused to apply that legal principle."  Jones, 792 F.3d at 402.  This "is not an invitation to review the merits of the underlying arbitration or to

establish that the arbitrator misconstrued or misinterpreted the applicable law." Id. (internal quotation marks omitted) (citation omitted). Rather, an arbitrator manifestly disregards the law when he was "aware of the law, understood it correctly, found it applicable to the case before [him], and yet chose to ignore it in propounding [his] decision." Remmey v. PaineWebber, Inc., 32 F.3d 143, 149-50 (4th Cir. 1994).

First, WMC argues that the arbitrator manifestly disregarded West Virginia contract interpretation principles by concluding that strategic pricing services were not a "functional area[] in [WMC's] revenue cycle process" as that phrase was used in the Turnaround Agreement. ECF No. 22-2 at 29. Specifically, WMC argues that this phrase should have been interpreted in light of the parties' course of performance, and that QIR provided strategic pricing services when it conducted an accounting analysis on WMC's chargemaster and service provider agreements using a program called "QRATE." However, the award makes clear that the arbitrator found in light of all of the evidence, including the parties' course of performance, that the Turnaround Agreement did not require QIR to provide strategic pricing services as part of its revenue cycle assessment. ECF No. 1-2 at 11-12. Further, the arbitrator specifically noted that "the QRATE was separate from the Revenue Cycle Assessment" that QIR was required to conduct under the Turnaround Agreement. Id. at 12. Thus, the arbitrator did not

fail to apply West Virginia contract interpretation principles. Rather, WMC simply disagreed with the arbitrator's interpretation of the contract.

Second, WMC argues that the arbitrator manifestly disregarded the law by excluding certain parol evidence. Specifically, the arbitrator excluded statements made by QIR's representatives during negotiations for the Turnaround Agreement that WMC argues show it was fraudulently induced into entering into the Turnaround Agreement. However, the arbitrator expressly recognized and applied the parol evidence rule. ECF No. 1-2 at 26-27. The arbitrator also applied the applicable standard for a claim of fraudulent inducement under West Virginia law. Id. at 41-42. Thus, even if the arbitrator misapplied these rules of law, he did not manifestly disregard them.

Third, WMC argues that the arbitrator manifestly disregarded the law in applying the gist of the action doctrine to exclude its negligence claim. WMC claims that QIR negligently provided strategic pricing services when it conducted the QRATE analysis, and because the arbitrator found that the Turnaround Agreement did not require QIR to provide such services, the negligence claim was outside the contract and not barred by the gist of the action doctrine. Assuming WMC's analysis is correct, this does not constitute manifest disregard of the law. The arbitrator applied,

correctly or incorrectly, the gist of the action doctrine. ECF No. 1-2 at 33-37.

Fourth, WMC argues that the arbitrator manifestly disregarded West Virginia law by concluding that West Virginia does not recognize causes of action for breach of the duty of loyalty or for corporate waste. Indeed, it does not appear that the West Virginia Supreme Court of Appeals recognizes a cause of action for corporate waste. Further, while the West Virginia Supreme Court of Appeals does recognize a cause of action for breach of a fiduciary duty, which includes a duty of loyalty, Smith v. First Cmty. Bancshares, Inc., 575 S.E.2d 419, 430-31 (W. Va. 2002), the arbitrator fully considered WMC's breach of fiduciary duty claims even while concluding that the West Virginia Supreme Court of Appeals has not recognized a cause of action specifically for the breach of the duty of loyalty. ECF No. 1-2 at 37-41. Thus, the arbitrator did not manifestly disregard West Virginia law regarding breaches of fiduciary duties.

Fifth, WMC argues that the arbitrator manifestly disregarded West Virginia law in concluding that interim corporate officers provided to WMC under the Turnaround Agreement were "borrowed employees" rather than QIR's employees such that QIR would be liable for those employees' alleged torts. Specifically, WMC argues that the arbitrator failed to consider the level of control

QIR exerted over these employees in determining whether they were borrowed employees.

Under West Virginia law, "in determining the employment status of a worker, . . . it is necessary to consider the entire circumstances of the relationship, the right to exercise control and supervision is . . . the determinative element." <u>Bowens v. Allied Warehousing Servs., Inc.</u>, 729 S.E.2d 845, 856 (W. Va. 2012). The arbitrator concluded that these employees were borrowed employees because the Turnaround Agreement conclusively stated so, and he did not inquire into the level of control QIR or WMC exerted over them. ECF No. 1-2 at 5. However, WMC fails to show that had the arbitrator considered the level of control and supervision QIR exercised over these employees, West Virginia law would dictate that those employees were agents of QIR. Regardless, the arbitrator concluded that WMC's tort-based counterclaims were meritless.

Sixth, WMC argues that the arbitrator manifestly disregarded the law by concluding that § 6.5 of the Turnaround Agreement was enforceable. That provision provides that

> Neither Party . . . shall have any liability to the Party for any indirect, consequential, incidental, exemplary, special or punitive damages or costs, including, without limitation, lost profits, loss of good will or loss of tax-empt status for [WMC] or [WMC's] financing, even if such Party has been advised, knew or should have known, of the possibility thereof.

ECF No. 22-2 at 14. WMC argued that the provision was unenforceable as to its intentional tort claims. The arbitrator concluded that he was "unaware of any reported case decided under West Virginia [law] invalidating a limitation of liability clause for this reason." ECF No. 1-2 at 49. WMC now argues that the arbitrator manifestly disregarded West Virginia law in concluding that the provision was enforceable as to the intentional tort claims.

Under West Virginia law "a general clause in a pre-injury exculpatory agreement or anticipatory release purporting to exempt a defendant from all liability for any future loss or damage will not be construed to include the loss or damage resulting from the defendant's intentional or reckless misconduct or gross negligence, unless the circumstances clearly indicate that such was the plaintiff's intention." Murphy v. N. Am. River Runners, Inc., 412 S.E.2d 504, 510 (W. Va. 1991). It is not entirely clear whether § 6.5 of the Turnaround Agreement is enforceable under this precedent. Thus, WMC fails to show that "the disputed legal principle is clearly defined and is not subject to reasonable debate." Jones, 792 F.3d at 402. Further, based on the award, the arbitrator was unaware of this precedent. The manifest disregard standard requires only that the arbitrator not knowingly disregard a rule of law he recognizes as applicable. Remmey, 32 F.3d at 149-50. The arbitrator here concluded that there was no applicable

West Virginia law invalidating such limited liability clauses.
Thus, he did not knowingly disregard an applicable rule of law
invalidating such provisions. Regardless, his failure to apply
potentially applicable precedent did not result in the award itself
being issued in manifest disregard of the law, as the arbitrator
also found WMC's intentional tort claims to be without merit.
Thus, his conclusion that § 6.5 was enforceable has no bearing on
whether the arbitrator would find that WMC was entitled to damages
on its intentional tort claims.

WMC also argues that the arbitrator's failure to invalidate
the limited liability provision is a violation of West Virginia
public policy against such provisions. It is unclear whether
courts may vacate an arbitration award that violates public policy
after the Supreme Court's decision in <u>Hall Street</u>,[2] however, under
pre-<u>Hall Street</u> precedent, an award may be vacated on this ground
only where: (1) the public policy is "well defined and dominant, as
ascertained by reference to the laws and legal precedents and not
from general considerations of supposed public interests"; and (2)
the award itself clearly violates that public policy. <u>W.R. Grace
& Co. v. Local Union 759, Int'l Union of the United Rubber, Cork,
Linoleum & Plastic Workers</u>, 461 U.S. 757, 766 (1983).

---

[2]In <u>Hall Street</u>, the Supreme Court concluded that § 10(a)
"provide[s] the FAA's exclusive grounds for expedited vacatur."
552 U.S. at 584. The Fourth Circuit has not yet determined whether
the common law public policy ground for vacatur is still viable
after <u>Hall Street</u>.

As discussed above, the laws and legal precedents of West Virginia do not clearly define a public policy against such provisions. Further, WMC argues that the arbitrator failed to recognize and enforce West Virginia's asserted public policy against limited liability provisions, not that the award itself violates that public policy. Regardless, the arbitrator also concluded that WMC failed to establish its intentional tort claims. Thus, even if the public policy ground is still viable after <u>Hall Street</u>, it is unavailable to WMC because the award itself does not violate West Virginia public policy.

Seventh, WMC argues that the arbitrator manifestly disregarded West Virginia Rule of Civil Procedure 8(c) by allowing QIR to assert an affirmative defense of illegality that it did not allege in its initial pleadings in the arbitration. However, as discussed above, the arbitrator was empowered to decide procedural issues, and this Court may not vacate the award based on procedural determinations reasonably based in the parties' agreement. <u>See Stolt-Nielsen</u>, 559 U.S. at 685-86. It is unclear from the parties' arbitration agreement whether West Virginia or the American Arbitration Association's rules of procedure applied to the arbitration, and this Court finds no basis in the agreement to vacate the award based on the arbitrator's procedural ruling.[3]

_____

[3]Section 8.1 of the Turnaround Agreement provides that the arbitration be conducted

This Court also notes that the award does not rely on or even mention QIR's affirmative defense of illegality. Further, even if West Virginia Rule of Civil Procedure 8(c) applied, that rule does not completely prohibit adding affirmative defenses after pleadings have closed. Clements v. Stephens, 211 S.E.2d 110, 113 (W. Va. 1975) (concluding that a court has discretion to permit a party to amend its pleadings to add an affirmative defense after pleadings have closed). Thus, the arbitrator's determination on this procedural issue was not in manifest disregard of the law.

3. Whether the Award was Procured by Fraud, Corruption, or Undue Means

WMC argues that QIR obtained the award by fraud, corruption, or undue means because QIR paid four fact witnesses for time spent traveling to and preparing for their testimony at the arbitration hearing. These witnesses were Michael Rolph ("Rolph"), Robert Lovell ("Lovell"), Stephen Miller ("Miller"), and Rhonda Duncan ("Duncan"), who worked at WMC during the contract period as interim CFO, interim COO, interim CFO, and Chief Nursing Officer respectively. QIR did not disclose these agreements until after

---

in accordance with the provisions of [the arbitration agreement] and the arbitration rules of the American Arbitration Association ("AAA") in effect on the date of this agreement . . . . The arbitration shall be governed by the substantive and procedural laws of the state of West Virginia applicable to contracts made and to be performed therein.

ECF No. 22-2 at 17-18.

the arbitration hearing when it filed a motion with the arbitrator for an award of attorneys' fees and costs.

A court may vacate an arbitration award if "the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). "The term 'undue means' has generally been interpreted to mean something like fraud or corruption." MCI Constructors, LLC v. City of Greensboro, 610 F.3d 849, 858 (4th Cir. 2010) (internal quotation marks omitted). Further, "no court has ever suggested that the term 'undue means' should be interpreted to apply to actions of counsel that are merely legally objectionable." Id. To prove that an award was procured by corruption, fraud, or undue means, the party seeking vacatur "must show that the fraud[,] [corruption, or undue means] . . . (1) [was] not discoverable upon the exercise of due diligence prior to the arbitration, (2) [was] materially related to an issue in the arbitration, and (3) [is] established by clear and convincing evidence." Id. (alterations in original).

a.   Whether the Witness Compensation Arrangements Constitute Corruption, Fraud, or Undue Means

WMC must establish by clear and convincing evidence that the witness compensation arrangements constitute fraud, corruption, or undue means. Id. These arrangements would clearly constitute corruption, fraud, or undue means if QIR paid the witnesses for, or

otherwise dictated, the content of their testimony. In that regard, WMC argues that it has evidence of quid pro quo payments.

First, WMC argues that Rolph changed his testimony between his pre-hearing deposition and the arbitration hearing. During his pre-hearing deposition, Rolph testified that he thought strategic pricing services were part of a revenue cycle assessment in general. After that deposition but before the arbitration hearing, Rolph reviewed the Turnaround Agreement, other witnesses' depositions, and documents related to the case, and spoke with QIR's counsel. Then, at the arbitration hearing, Rolph testified that he did not think the contract term "functional areas in [WMC's] revenue cycle process" included strategic pricing services. ECF No. 22-2 at 29. WMC asked Rolph if he had discussed his pre-hearing deposition testimony on this issue with anyone between the time of his first deposition and the hearing, and Rolph said he had not done so. WMC argues that Rolph spoke with QIR's counsel, Lesemann, on the phone for hours between the time of his pre-hearing deposition and the arbitration hearing.

This Court is not convinced that QIR or Lesemann induced Rolph to change his testimony. WMC has not demonstrated that Rolph actually changed his testimony in any way, as his pre-hearing deposition testimony stated his belief that strategic pricing services are part of a generalized revenue cycle assessment, while at the arbitration hearing he testified that he did not believe the

21

Turnaround Agreement required strategic pricing services as part of QIR's obligation to provide a revenue cycle assessment.[4] But, even if WMC is correct in alleging that Rolph changed his testimony (a generous inference), this hardly constitutes clear and convincing evidence of witness tampering or that QIR's counsel paid Rolph for the content of his testimony, especially where Rolph denied such an arrangement in his post-hearing deposition.

Second, WMC argues that this Court may infer the witnesses were paid for the content of their testimony because the compensation was far in excess of West Virginia statutory witness fees. See W. Va. Code § 59-1-16. However, exceeding the statutory witness fees does not provide clear and convincing evidence of witness tampering.

WMC has not shown by clear and convincing evidence that the witnesses were paid for the content of their testimony. Nevertheless, WMC argues that the compensation arrangements themselves were improper and that this constitutes undue means. First, WMC argues that the term "consulting" as used in the witnesses' invoices shows that they were paid to assist QIR's counsel in arbitrating the case. However, Rolph testified in his post-hearing deposition that he simply spoke with QIR's counsel

---

[4]This Court also notes that the Turnaround Agreement specifically enumerated what analysis was required to be included in the revenue cycle assessment, and the agreement did not specifically state that strategic pricing services were a required part of that analysis. See ECF No. 22-2 at 29.

about the arbitration but did not provide any advice or expertise as a consultant. ECF No. 35-1 at 48-51. Thus, there is no evidence that Rolph, or any other compensated witness, was a paid member of QIR's legal team.

Second, WMC argues that Lovell, Rolph, Miller, and Duncan breached fiduciary duties they owed to WMC by cooperating with QIR's counsel in the arbitration. Because they were former officers of WMC, WMC argues that the witnesses owed continuing fiduciary duties to WMC after leaving their positions there. Regardless of whether the witnesses owed continuing duties to WMC, a breach of any such duty clearly does not constitute "fraud, corruption, or undue means" under the FAA.

Third, WMC argues that the witness compensation agreements constitute undue means because QIR's counsel acted unethically in compensating the witnesses in that way. However, this Court is not convinced that the payments violate any potentially applicable rules of professional conduct. The practice of compensating a fact witness for time spent preparing for his or her testimony may be disfavored, but it is not _per se_ unethical behavior.[5]  See Pa. Ethics Op. 95-126A (1995) (providing that Pennsylvania law does not

_____

[5]This Court notes that Pennsylvania's Rules of Professional Conduct likely would apply to counsels' actions in the arbitration. See W. Va. Rule of Professional Conduct 8.5(b) (providing that the rules of professional conduct applying to "conduct in connection with a matter pending before a tribunal, [are] the rules of the jurisdiction in which the tribunal sits").

expressly prohibit, but may disfavor, "compensation to nonexpert witnesses for the time invested in preparing for testimony"); Am. Bar Ass'n Formal Ethics Op. 96-402 (1996) (concluding that compensation to a witness for "time the witness has lost in order to give testimony" does not violate the Model Rules "[a]s long as it is made clear to the witness that the payment is not being made for the substance or efficacy of the witness's testimony"). At best, the witness compensation arrangements here may expose QIR's counsel to disciplinary action, <u>see</u> Pa. Ethics Op. 95-126A (1995) (noting that "compensating a nonexpert witnesses for preparation time is not without risk of disciplinary enforcement action"), but that does not amount to clear and convincing evidence of fraud, corruption, or undue means.

> b. <u>WMC's Opportunity to Discover the Compensation Arrangements</u>

Even if the witness compensation arrangements did constitute fraud, corruption, or undue means, WMC had an opportunity to discover them before the arbitration award became final. In fact, WMC was aware of the arrangements before the arbitrator issued the final award. After the arbitrator issued his findings of fact and conclusions of law, QIR filed a motion for attorneys' fees and costs as provided in the parties' arbitration agreement. Part of QIR's requested costs included the witnesses' compensation. The arbitrator even allowed WMC to depose Rolph, Miller, and Duncan

regarding the time they spent in preparing for their testimony at the arbitration hearing, including the bases for their compensation and the content of discussions they had with QIR's counsel. WMC had the opportunity to ask these witnesses, under oath, whether they were offered compensation for the content of their testimony at the arbitration hearing. WMC did not do so. Thus, WMC knew of the witness compensation arrangements before the arbitration was completed and WMC could have discovered through exercise of due diligence any corruption, fraud, or undue means involved in the witness compensation agreements.

      c.   <u>Whether the Compensation Arrangements Materially Affected the Award</u>

Even if Lovell, Rolph, Miller, or Duncan's testimony was in some way tainted by their compensation arrangements, there is no evidence that the taint materially influenced the outcome of the arbitration. In fact, in the arbitrator's findings and conclusions consisting of forty-nine pages, seventy-seven paragraphs of factual findings, and ninety-eight paragraphs of legal conclusions, the arbitrator mentions the compensated witnesses' testimony only twenty-one times. Further, the award relies on the deposition and hearing testimony of other fact witnesses for even the portion of Rolph's testimony that WMC argues changed. Thus, WMC fails to show that the award was procured by corruption, fraud, or undue means.

B.  <u>WMC's Motion to Supplement the Record and Take Discovery</u>

WMC seeks to take discovery on the issue of QIR's payments to Lovell, Rolph, Duncan, and Miller, and on QIR's counsel's representations that the parties met and conferred before the arbitration hearing and stipulated to the submission of proposed awards for the arbitrator to adopt.  Specifically, WMC seeks to depose QIR's counsel, Lesemann, regarding the witness compensation arrangements, his conversations with those witnesses, and whether he directed them to change their testimony.

Generally, discovery is unwarranted in post-arbitration review proceedings, as those proceedings are intended to be summary in nature.  <u>Taylor v. Nelson</u>, 788 F.2d 220, 225 (4th Cir. 1986); <u>Lyeth v. Chrysler Corp.</u>, 929 F.2d 891, 898 (2d Cir. 1991).  Courts have broad discretion in determining whether and to what extent discovery should be permitted in such proceedings.  <u>See</u> <u>Lyeth</u>, 929 F.2d at 898 ("The district court has discretion to deny discovery in a proceeding to confirm an arbitral award.").

Discovery regarding the witness compensation arrangements is unnecessary.  QIR provided WMC and the arbitrator with copies of those witnesses' invoices, detailing the amounts and purposes of each witnesses' compensation.  WMC deposed Rolph, Miller, and Duncan regarding their compensation arrangements.  WMC could have asked those witnesses whether they were paid for the content of their testimony, but did not do so.  Because WMC was able to depose

the witnesses about the compensation arrangements, it is unnecessary for WMC to depose QIR's counsel. Further, as discussed above, WMC's allegations that those witnesses' testimony was tainted are speculative, and there is no evidence that any alleged taint materially affected the outcome of the arbitration.

Discovery on the issue of whether the parties stipulated to the arbitrator's adoption of their proposed awards is also unnecessary. As discussed above, this Court finds that the arbitrator's adoption of QIR's proposed award is not a viable ground for vacating the award. Discovery regarding whether both parties understood that their proposed awards might be adopted in full by the arbitrator is irrelevant to whether the award may be vacated under the FAA. Accordingly, WMC's motion to take discovery is denied.

C.   <u>WMC's Motion to Disqualify Counsel</u>

WMC seeks to disqualify Lesemann as counsel for QIR because it seeks to depose him regarding the witness compensation agreements. Because this Court denies WMC's motion for limited discovery, WMC's motion to disqualify Lesemann must also be denied.

### III.   <u>Conclusion</u>

This Court finds that there are no grounds to vacate the arbitration award, and that it must be confirmed. Accordingly, the plaintiff's motion to vacate the arbitration award (ECF Nos. 3, 5) is DENIED, the plaintiff's supplemental motion to vacate (ECF No.

12) is DENIED, the plaintiff's renewed motion to vacate (ECF No. 40) is DENIED, the plaintiff's motion to supplement the record and take discovery (ECF No. 35) is DENIED, and the plaintiff's motion to disqualify counsel (ECF No. 25) is DENIED. The defendant's motion to confirm the arbitration award (ECF No. 41) is GRANTED.

Pursuant to 9 U.S.C. § 9, it is ORDERED that a judgment be entered in favor of the defendant against the plaintiff in the amount of $1,486,903.11 plus prejudgment interest accruing from January 21, 2016, the date of the final award, to the date of the entry of this order.

Further, it is ORDERED that this civil action be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:   May 12, 2016


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE